IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DIANA SMITH
    *Plaintiff*,

v.

CAESARS BALTIMORE
MANAGEMENT COMPANY, L.L.C.
    *Defendant*.

Civil No. ELH-17-3014

**MEMORANDUM OPINION**

In this employment case, Diana Smith filed suit against Caesars Baltimore Management Company, LLC, trading as Horseshoe Baltimore Management Co. ("Caesars" or the "Company"), alleging that she was terminated in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*, and the Maryland Fair Employment Practices Act ("FEPA"), Md. Code (2014 Repl. Vol., 2018 Supp.), § 20-606 of the State Government ("S.G.") Article. *See* ECF 2 (the "Complaint"); ECF 13 ("First Amended Complaint"); ECF 25 ("Second Amended Complaint").[1] According to Smith, Caesars suspended her and then terminated her for taking FMLA leave to bring her minor son to a doctor for an asthma episode. *See* ECF 25 at 3-5 (citing 29 U.S.C § 2615(a)). She also claims that her supervisors gave her "a disapproving look" when she informed them of her pregnancy. ECF 25, ¶¶ 2, 21-28 (citing S.G. § 20-606).

Following discovery, Caesars moved for summary judgment (ECF 39), supported by a memorandum of law (ECF 39-1) (collectively, the "Motion") and numerous exhibits. ECF 39-3 to ECF 39-40. Plaintiff opposes the Motion (ECF 40, the "Opposition") and has submitted several

---

[1] Plaintiff originally filed suit in the Circuit Court for Baltimore City. However, on the basis of federal question jurisdiction, defendant removed the case to federal court. ECF 1.

exhibits. ECF 40-1 to ECF 40-13; ECF 40-16. Notably, in her Opposition, plaintiff abandoned her claim of pregnancy discrimination due to a lack of evidence. ECF 40 at 3. Defendant replied (ECF 43) and filed an additional exhibit. ECF 43-1.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall DENY defendant's Motion. ECF 39.

## I.    Factual and Procedural Background[2]

On July 28, 2014, Smith began working as a slot attendant at the Horseshoe, a Baltimore casino operated by Caesars. ECF 39-25, ¶¶ 2, 4; ECF 39-4 at 3: 9-12. When she started work, she received an employee handbook. ECF 39-4 at 11:10 to 12:2; ECF 39-5 at 2. Between October 2014 and January 2015, she received two "documented coachings" for failure to follow Company policies. ECF 39-6 at 2; ECF 39-7 at 2. The first coaching resulted from absences from work, in violation of defendant's attendance policy. ECF 39-6 at 2. The second coaching resulted from her failure to turn in unspecified receipts. ECF 39-7 at 2.

In December 2015, Smith applied for intermittent FMLA leave—"leave taken in separate blocks of time due to a single qualifying reason"—so that she could tend to her son. 29 C.F.R. § 825.202(a); ECF 39-4 at 24:1-8. I shall refer to Smith's son by his initials, "A.C.", to protect his privacy. Born in 2013, A.C. suffers from dermatitis, asthma, and allergies related to his asthma. ECF 40-1, ¶ 3.

To effectuate her requested leave, Smith contacted human resources ("HR"), and H.R. provided Smith with a phone number to call Caesars' centralized employee service center ("ESC").

---

[2]  The facts set forth in this section are undisputed, unless otherwise noted.

ECF 39-4 at 24:5. ESC administers FMLA leave for Caesars. ECF 39-25, ¶ 10. Supervisors at the Horseshoe do not make decisions regarding FMLA leave, such as eligibility for FMLA leave, certification for FMLA leave, or length of FMLA leave. *Id.* ¶¶ 10-11.

When Smith called the phone number, the ESC instructed her to obtain information from her son's doctor and to fax it to them for approval. ECF 39-4 at 24:6-7. She followed their instructions, and submitted a "Family Member Serious Health Condition Leave Certification Form" to the ESC on January 6, 2016. *Id.* at 24:12 − 25:21; *see also* ECF 39-8 (incorrectly noting the date as January 6, 2015).

The ESC approved plaintiff's request for intermittent FMLA leave for a one-year period from January 5, 2016 to January 5, 2017. ECF 39-4 at 27:19-21. By letter dated January 13, 2016 (ECF 39-26), the ESC informed Smith's then-supervisors in the Slots Department that she had been approved for intermittent FMLA leave. ECF 39-25, ¶ 13. The letter did not state the reason for Smith's FMLA leave, nor was it sent to any other department, such as the Food and Beverage Department where Smith would later work. *Id.* ¶ 14; ECF 39-26 at 3.

The ESC directed Smith to use the call-out line to request leave. ECF 39-4 at 30:12 − 31:6 She was directed to say: "This is Diana Smith. I'm calling out for this date and I'm using FMLA for my son." *Id.* Pursuant to Caesars' employee handbook, "[w]hen a Team Member calls off for intermittent leave she/he must confirm that the absence is related to a previously approved FMLA leave." ECF 39-28 at 3. In 2016, Smith took FMLA leave on at least three days, with the last occurring around August 13, 2016. ECF 39-25, ¶ 16; ECF 29-27.

At her deposition, Smith testified that she was familiar with the process of requesting FMLA leave. ECF 39-4 at 32:9-11. She also testified that she was not treated differently after applying for FMLA leave, nor after being approved for intermittent FMLA leave. *Id.* at 32:15-20. Further, she stated that no one interfered with her use of intermittent FMLA leave. *Id.* at 32:21 – 33:5. After her intermittent FMLA expired on January 5, 2017, Smith did not contact ESC to renew the approval for intermittent leave. *Id.* at 33:6-8. Nor did she use FMLA leave in 2017, other than the contested use on May 19 and May 20 of 2017, discussed below. *Id.* at 29:21 – 30:2.

On November 18, 2016, Smith was promoted to "Supervisor" in the Beverage Department. *See* ECF 39-25, ¶ 7. In this new role, she was responsible for overseeing between 25 and 40 employees, ensuring that the cocktail servers provided "proper service," and "assigning responsibilities and job duties to the bar porters, bartenders, and servers" throughout the casino. ECF 39-4 at 5:18 – 6:3; ECF 39-10 at 3:11-16.

Upon Smith's transfer to the Beverage Department, she reported to different managers. ECF 39-25, ¶ 8. The Food and Beverage Department, where Smith worked, was led by the Vice President of Food and Beverage, Jay Lattimer. Food and Beverage Operations Manager Henry Olaya served underneath him. Kristin Carter served under Olaya as the Assistant Beverage Manager; she was also Smith's direct supervisor. Smith and at least three other employees were Beverage Supervisors. ECF 39-31, ¶ 9. None of Smith's supervisors had managed her when she was a slot attendant. ECF 39-25, ¶ 9.

In March 2017, plaintiff received a "documented coaching" for failing to report to work with her gaming license. ECF 39-11. On April 26, 2017, Smith emailed Olaya stating: "I would

like to request 5/19 − 5/22/17 off it is very important. Pleaaaaaasssseeeeee if possible [sic]." ECF 39-12. Olaya replied by email, informing her that he could only approve time off for May 21 and May 22, 2017. ECF 39-13. Olaya marked these two days as "personal time off" on office-wide schedules that he circulated on April 30, 2017. ECF 39-14; ECF 39-15.

At plaintiff's deposition, defense counsel asked her why the time off was important to her. Smith explained: "I felt very overworked . . . I just found out I was pregnant and I needed some time off." ECF 39-4 at 33:21 − 34:4. Further, she testified that she chose those specific days because she "knew probably no one else would have those days." *Id.* at 34:5-8. And, in her Declaration (ECF 40-1), she stated that she made the request because her "PTO was expiring" and May 20, 2017 was her friend's birthday. *Id.* ¶ 17.[3]

On May 17, 2017, Smith received a call from her sister, inviting her to go to Ocean City, Maryland. ECF 39-4 at 35:18-19. Smith testified that she told her sister: "I had to be home with the baby on May the 19th or I told her I had to work on May the 19th and May the 20th." *Id.* at 35:20 − 36: 1. As of May 18, 2017, Smith had agreed to go to Ocean City on May 21 and return on May 22. *Id.* at 35:11-15.

While working at the Horseshoe on May 18, 2017, Smith received a phone call from Sharon Uzzell, her son's daycare provider. ECF 40-1, ¶ 6. Uzzell told Smith that A.C. was wheezing and

---

[3] The parties do not define "PTO." The Court surmises that it means either "paid-time off" or "personal time off." *See, e.g.*, https://en.wikipedia.org/wiki/Paid_time_off ("Paid time off or personal time off (PTO) is a policy in some employee handbooks that provides a bank of hours in which the employer pools sick days, vacation days, and personal days that allows employees to use as the need or desire arises.").

having problems breathing. *Id.* Smith contacted the office of her son's physician, Dr. Kevin Kelly, but she could not get an appointment for A.C. until the next day. *Id.* ¶ 7. Smith was afraid that A.C.'s condition would worsen, as it had in the past when A.C. did not receive prompt medical care. *Id.* ¶ 8. Furthermore, Smith was running out of A.C.'s nebulizer formula and Ventolin solution for his inhaler. *Id.* But, Smith did not want to take the child to any other healthcare provider because Dr. Kelly had the most familiarity with A.C.'s condition. *Id.*

Between May 4, 2016 and May 18, 2017, Dr. Kelly treated A.C. for asthma and allergies on six different occasions. ECF 40-1, ¶ 5. For A.C.'s previous asthma episodes, Dr. Kelly had directed Smith to stay home with A.C. for two days. *Id.* ¶ 13. Therefore, Smith attempted to find a substitute to fill in for her on May 19 and May 20, 2017. However, she was unsuccessful. *Id.*

On May 18, 2017, Smith's supervisors received information that Smith planned to use the hourly employee call-out line to take time off from work on May 19 and May 20, 2017. ECF 39-10 at 7: 8-10; ECF 39-22, ¶ 3; ECF 39-23 at 2. Kristen Carter, Smith's immediate supervisor, called Smith around 5:30 p.m. on May 18, 2017. ECF 39-4 at 40:2-10; ECF 39-31, ¶ 3. At Smith's deposition, she recounted the call, ECF 39-4 at 40:12-20:

> [Carter] said that [she] was told that [Smith] might be calling out tomorrow which is May 19th for [Smith's] son. And I told her, yes, I was trying to get [Beverage Supervisors] Katya [Waters] and Lisa [Petkovich] to work for me and both of them told me that they couldn't work for me. So I was trying to call around to see if someone else can take my son to the doctor's and I hadn't heard anything yet, but I wasn't going to call out yet. But if I do, I was going to let you all know.

Smith also told Carter, "I will have to take leave for my son on [May 19 and] May 20, 2017." *Id.* at 43:7-15. And, Smith said that if her son was feeling better, she might make a doctor's appointment for herself because she has also been sick. *Id.* at 42:11-16.

Carter asked what Smith would be doing on May 20. *Id.* at 41:10-11. Smith responded, "[C]an you grant me May 20th off also because I know that I will have to continue treatment for my son for 24 hours which will be May the 20th." *Id.* at 41:11-14. Carter said yes, and asked whether Smith's "son was okay." *Id.* at 41:15-16, 42:2.

At some point during the call, Smith told Carter that she intended to use the call-out line. *Id.* at 40:21 – 41:3. Carter replied that using the call-out line "was inappropriate because managers and supervisors don't use the call out line." *Id.* at 41:4-5. "So [Smith] said okay." *Id.* at 41:5-6. In Carter's Declaration, she explained that it is a violation of Horseshoe policy for supervisors not to notify their managers directly about intended absences from work. ECF 39-31, ¶ 5. Although this policy does not appear to be in Caesars' employee handbook (ECF 39-29), at least one beverage supervisor appeared to be aware of it. *See* ECF 39-25.

Smith did not use the term "FMLA" during her conversation with Carter on May 18, 2017. ECF 39-4 at 43:3-4. She also did not contact the ESC at any time to request FMLA leave for May 19 and May 20, 2017. *Id.* at 43:16-19. Nor did she use the Company's employee call-out line at that time to obtain leave.

Carter testified that she was unaware that Smith's son had asthma or that Smith had previously been approved for FMLA leave. ECF 39-31, ¶ 19. But, in Smith's Declaration, she asserts: "Ms. Carter was aware that my son had asthma and allergies because I had told her about it in the past, and because I submitted to my employer Family Member Serious Health Condition Certification form for intermittent medical leave for the period January 5, 2016 through January 5, 2017." ECF 40-1, ¶ 10.

As noted, the ESC only notified the Slots Department that Smith was entitled to FMLA. ECF 39-25, ¶ 14.  Further, the ESC did not tell the Slots Department why Smith was entitled to leave.  *Id.* Indeed, Lattimer and Olaya also stated that they were not aware that Smith's son had asthma.  ECF 39-16 at 10:2-4, 14-20 (Lattimer); ECF 39-10 at 4:4 – 5:2 (Olaya).

About an hour after Smith and Carter finished their conversation on May 18, 2017, Carter was shown a Facebook post allegedly made by Smith.  ECF 39-31, ¶ 6; ECF 39-32.  The Facebook post said, ECF 39-21 (alteration added):

> For the record i don't need no [rat emoji] running back telling no one nothing i can tell them myself. I believe im grown and i make my own decisions so yes i will be calling out tomorrow. Grown ass people i tell u.  On that note GN

Smith allegedly commented on her own post, stating: "No its the ones in my department." *Id.*  The original post was seen and "liked" by at least 21 people, including a Horseshoe employee, Shelby Bonomolo, whom Smith "partly" supervised.  *Id.*; ECF 39-4 at 10:3-4 ("I would supervise [Shelby], but partly.") *see also* ECF 39-31, ¶¶ 7-8; ECF 39-32.   It is undisputed that these comments were posted on Smith's Facebook account. *See* ECF 40-1, ¶ 19. However, Smith stated in her Declaration, "I genuinely do not recall ever writing the Facebook post at issue in this case. It does appear to be on my web page, but many people have access to my Facebook page and anyone [sic] of them could have written it." *Id.*

The next day, May 19, 2017, Smith took A.C. to Dr. Kelly. *Id.* ¶ 11.  Dr. Kelly prescribed several medications for the child and directed Smith to stay home and monitor A.C.'s medication. *Id.* ¶¶ 11-12.  He also gave Smith a note to take off work on May 19 and May 20, 2017. *Id.* ¶ 12.

On May 20, 2017, Smith went to Ocean City to meet her sister. ECF 39-4 at 37: 8-10. She did not bring her son. ECF 39-4 at 46:12-14. On May 21 and May 22, 2017, Smith took her scheduled time-off. ECF 39-31, ¶ 18. And, on May 23, 2017, she did not have a scheduled shift. *Id.*

Meanwhile, Smith's supervisors were discussing Smith's conduct with HR personnel: Lori Goldenthal, Manager Employee and Labor Relations, and Jeff Scher, Employee and Labor Relations Specialist. ECF 39-10 at 13:21 – 14:15; *see also* ECF 39-25, ¶ 1. According to Olaya, he and Lattimer told Goldenthal and Scher about Smith's actions and asked for a recommendation. ECF 39-10 at 14:8-10. Goldenthal and Scher suggested a "suspension of employment pending investigation." ECF 39-25, ¶ 20; *see also* ECF 39-10 at 14:12-13; ECF 39-16 at 8:7-10.

When Smith returned to work on May 24, 2017, she left a copy of Dr. Kelly's note (ECF 40-4 at 2) on Carter's desk. ECF 40-1, ¶ 14. Smith's supervisors told her that she was suspended pending an investigation into her Facebook post and improper plan to use the call-out line. ECF 39-4 at 4:1-8; *see also* ECF 39-16 at 8:20-9:15. She also signed a Performance Documentation Form (ECF 39-19) stating that she was receiving a suspension pending investigation. It states, in part, ECF 39-17 at 2:

WHAT was the actual behavior observed (versus the expectation)?

On April 26th Diana requested PTO on 5/19/17-5/22/17. I replied on the same day 4/26/17 that we could only grant her PTO for 5/21/17 & 5/22/17. On Thursday 5/18/17 we got word that Diana intended to call out for Friday 5/19/17 and Saturday 5/20/17. Kristin Carter called her and asked her if this was true and she said yes and was planning on using the front line call out line as opposed to calling her supervisor or manager. Diana did not show for work on 5/19/17 or 5/20/17. Diana took to facebook where she made an inappropriate post about work which was also viewed by subordinates

The Performance Documentation Form further details the "rules of the road" that Smith allegedly violated, *id.*:

> #1 Team Members will demonstrate courtesy, friendliness, and upbeat and positive attitude, appropriate greetings, initiative to assist, professional language/tone/manner/actions with guests, co-workers and vendors.
>
> #12 Team Members will use professional judgment and will refrain from acts of gross misjudgment, carelessness, negligence in the performance of one's job, or any conduct detrimental to the orderly and ethical operation of the business.
>
> #13 Team Members will act with respect and will not demonstrate insubordination including failure to act with respect, or to refuse or fail (despite warning) to perform assigned duties in accordance with performance standards.
>
> Pg. 42/43 Violation of our Social Networking Policy

The referenced "rules of the road" were set forth in the employee handbook (ECF 39-29) that Smith received upon starting work at the Horseshoe. ECF 39-5; ECF 39-25, ¶ 26. The Company's Social Networking Policy provides, in relevant part, that an employee "should not post content about the Company, management, co-workers or customers that is vulgar, obscene, threatening, intimidating, defamatory, harassing, or a violation of the Company's policies against discrimination and harassment." ECF 39-29 at 8.

The Company subsequently conducted an investigation into Smith's behavior. On May 25, 2017, "at the request of Jeff Scher, [Carter] asked Smith's fellow Beverage Supervisors—Katya Waters, Laura Yi, and Lisa Petkovich—to report what they remembered regarding Smith's decision to call out of work." ECF 39-31, ¶ 9. By email, Waters told Carter, "Diana was talking about calling out on Sunday specifically for about a week." ECF 39-33 at 2. Likewise, in an email to Carter, Yi wrote, "While reviewing the May schedule in night bar with Diana. She explained to

me that she had bought flights already and her PTO was denied in turn she was going to call out."

ECF 39-34 at 2. And, Petkovich emailed Carter, stating, in part, ECF 39-35:

> On May 18th . . . . Diana asked me if I could come into work early so Katya could leave early so the following day Katya could come I[n] and relieve Diana a few hours early. Before I could answer Diana said "If you don't I'm going to call out tomorrow." I told her she has to do what she has to do but she needs to let Kristin [Carter] and Henry [Olaya] know so they can find coverage or cover for her if needed. Diana said she "will just call out tomorrow" because she needed to be off at 1 and didn't think anyone would let her leave early. The conversation ended after that.

On May 25, 2017, Scher also contacted Smith by telephone. ECF 39-37, ¶ 4. In his Declaration, Scher stated that "Smith admitted that she posted the Facebook message." *Id.* ¶ 5. Smith also allegedly stated that Waters or Petkovich told management about the Facebook post. *Id.* ¶ 6. Scher asserts that these statements are reflected in his handwritten notes from that call. *See* ECF 39-38 at 2. His notes state, in relevant part. ECF 39-38: "Posted the facebook message. Knew it was either Lisa or Katya who told." (Formatting altered).

In her Declaration, Smith denies speaking with Scher "about anything related to this case." ECF 40-1, ¶ 20. However, during her deposition, Smith testified that she spoke with Scher about the Facebook post and her use of the call-out line. ECF 43-1 at 4:18 − 5:3. Nevertheless, in both her Declaration and deposition testimony, Smith denied that she wrote the Facebook post denied. ECF 40-1, ¶ 19; ECF 43-1 at 4:18 − 5:3. Likewise, she denied telling Scher that she wrote the post. ECF 40-1, ¶ 20; ECF 43-1 at 4:18 − 5:3.

At Scher's request, Carter, who was Smith's immediate supervisor, completed an Employee Statement Form. ECF 39-31, ¶¶ 14-15. In the Form (ECF 39-36), Carter described her call with Smith on May 18, 2017. ECF 39-36. According to Carter, she asked Smith: "'[W]ere you

going to call the call out line?'" Smith responded, "yes." ECF 39-36 at 2. Carter "explained [to Smith that] 'as someone in management, calling the call out line was not appropriate' and that protocol as a supervisor is to tell myself or Henry [Olaya] so we can cover the floor properly." *Id.* at 2-3. Further, Carter criticized Smith's Facebook post, stating that it was "highly inappropriate to share department information for public view by those that need to work under Diana and her fellow supervisors." *Id.*; *see also* ECF 39-31, ¶¶ 16-17. Lattimer and HR personnel agreed that the Facebook post was inappropriate, particularly for a supervisor. ECF 39-16 (Lattimer) at 14:10 – 15:14; ECF 39-37 (Scher), ¶ 10; ECF 39-25 (Goldenthal), ¶ 25.

Lattimer and Goldenthal were the final decisionmakers with respect to Smith's termination. ECF 39-25, ¶ 23; ECF 39-37, ¶ 1. On May 26, 2017, Caesars issued a Separation of Employment document to Smith. ECF 39-18. The document listed the same behavior and reasons for discipline as the document of May 24, 2017, which provided for her suspension pending investigation. ECF 39-4 at 52:8 – 53:13; ECF 39-10 at 10:2 – 11:15; ECF 39-17; ECF 39-18.

Goldenthal and Olaya claim that Smith was terminated because of her Facebook post and her intended misuse of the hourly employee call-out line, and not because of her unexcused absences from work on May 19, 2017 and May 20, 2017. ECF 39-10 at 15:2-14; ECF 39-25, ¶ 32. Goldenthal also stated in her Declaration: "I did not investigate the reason for Smith's absences on May 19, 2017 and May 20, 2017 because the absences played no role in any of the discipline issued." ECF 39-25, ¶ 32. Likewise, Lattimer testified that a "combination of things" led to Smith's termination. In addition to Smith's Facebook post, Lattimer cited the "way" Smith "handled" not coming into work. ECF 39-16, at 15:18. Specifically, he testified, "[K]nowing that

you wouldn't be coming to work, but not immediately notifying your supervisor, in a leadership role is something that's – you know, seen as very unprofessional." *Id.* at 16:2-6.

Lattimer, Olaya, and Goldenthal stated that they were not aware of any other Horseshoe supervisor previously having intended to misuse the hourly employee call-out line or having posted a "derogatory Facebook message" that was liked by a subordinate. ECF 39-16 at 12:13 – 13:2 (Lattimer); ECF 39-22, ¶¶ 5-8 (Olaya); ECF 39-25, ¶¶ 28-30 (Goldenthal). Lattimer and Olaya also said that before Smith, they had not disciplined an employee for making an improper Facebook post. ECF 39-16 at 12:19 – 13:3 (Lattimer); ECF 39-22, ¶ 6 (Olaya). They also were not aware of any supervisor being disciplined as the result of such activities. ECF 39-16 at 12:13 – 13:2 (Lattimer); ECF 39-22, ¶¶ 5-8 (Olaya).

On July 21, 2017, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission. ECF 25, ¶ 11. She filed suit on October 13, 2017. ECF 1.

## II.    Standard of Review

Defendant has moved for summary judgment under Fed. R. Civ. P. 56. Rule 56(a) provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."). The nonmoving party must demonstrate that there are disputes of material fact

so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co.,*
*Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

The Supreme Court has clarified that not every factual dispute will defeat the motion. "By
its very terms, this standard provides that the mere existence of *some* alleged factual dispute
between the parties will not defeat an otherwise properly supported motion for summary judgment;
the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby,*
*Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect
the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material
fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."
*Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016); *Raynor v. Pugh*, 817
F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).

"A party opposing a properly supported motion for summary judgment 'may not rest upon
the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing
that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d
514, 522 (4th Cir. 2003) (alteration in *Bouchat*) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*,
541 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322-24. Moreover, in resolving a summary
judgment motion, a court must view all of the facts, including reasonable inferences to be drawn
from them, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. Ltd.*,
475 U.S. at 587; *accord Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Roland v. United*
*States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720
F.3d 169, 173 (4th Cir. 2013). However, summary judgment is appropriate if the evidence "is so

one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

The judge's "function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Moreover, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

### III.    Sham Affidavits

Smith contends that the Court should disregard the Declaration of Lori Goldenthal (ECF 39-24) and the Declaration of Henry Olaya (ECF 39-25) because they materially contradict "Defendant's Answer to Interrogatory No. 3" (ECF 40-7) and thus violate the "sham affidavit rule." *See* ECF 40 at 9-10. Likewise, Caesars argues in its reply that Smith's Declaration (ECF 40-1) should be stricken because it contradicts her prior deposition testimony (ECF 39-4). *See* ECF 43 at 19-21.

The "sham affidavit rule" was initially articulated by the Second Circuit in *Perma Research & Development Co. v. Singer*, 410 F.2d 572, 578 (2d Cir. 1969). The *Perma* Court considered an affidavit in which Perma's president averred that a representative of Singer had told him that Singer never had any intention of performing on the contract at issue in the case. *See id.* at 577. At summary judgment, Perma advanced the affidavit of this conversation as evidence of Singer's fraud. However, Perma's president had not previously mentioned the alleged conversation in four days of deposition testimony, in which he had been directly questioned as to any evidence he possessed of Singer's intention not to perform the contract. *Id.* The Second Circuit affirmed the trial court's entry of summary judgment in favor of the defendant, stating that the trial court "could properly conclude that the statement made in the affidavit was less reliable than the contradictory statements in the deposition, and that it did not raise a triable issue of fraud." *Id.* (internal citation omitted). It reasoned: "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.* at 578.

The Fourth Circuit adopted the rationale of *Perma* in *Barwick v. Celotex Corp.*, 736 F.3d 946, 960 (4th Cir. 1984), reasoning that a "genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." Later, in *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795 (1999), the Supreme Court provided the following formulation of the sham affidavit rule, stating: "[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by

contradicting his or her own previous sworn statement (by, say, filing a later affidavit that *flatly contradicts* that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Id.* at 806 (emphasis added).[4]

Of course, "'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Okoli v. City of Baltimore*, 648 F.3d 216, 231 (4th Cir. 2011) (quoting *Liberty Lobby*, *supra*, 477 U.S. at 255). In order to avoid infringing upon the province of the fact finder, application of the sham affidavit rule at the summary judgment stage must be carefully limited to situations involving flat contradictions of material fact. What the Ninth Circuit said in *Van Asdale v. International Game Technology*, 577 F.3d 989, 998-99 (9th Cir. 2009) (internal citation omitted), is salient:

> [T]he inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit. Thus, "the non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition [and] minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit."

Plaintiff misapplies the sham affidavit rule. The rule is directed at preventing a party from contradicting earlier sworn deposition testimony. But, plaintiff does not maintain that the declarations of Goldenthal and Olaya contradicted their deposition testimony. Indeed, Goldenthal

---

[4] The *Cleveland* Court recognized that the federal appellate courts adopted the sham affidavit rule "with virtual unanimity," but declined to "necessarily endorse these cases," although it adopted a similar rule with respect to whether a person who applies for social security disability benefits (which requires a disability so severe as to preclude the recipient from working) is thereby estopped from pursuing a disability discrimination claim under the Americans with Disabilities Act (which requires that a plaintiff show that she can perform the essential functions of a job, at least with reasonable accommodation). 526 U.S. at 806.

was not even deposed. Nor does plaintiff assert that the declarations contradicted Rosenthal's or Scher's statements elsewhere. Rather, plaintiff asserts that the declarations contradict Caesars' interrogatory response, which was verified not by Goldenthal or Olaya, but by Jeff Scher. *See* ECF 40-7 at 10. Smith cites no authority supporting such a broad application of the sham affidavit rule. Accordingly, I shall not apply it here.

Caesars contends that two assertions in Smith's Declaration of October 1, 2018, contradict her earlier deposition testimony on June 28, 2018. The first alleged contradiction that Caesars identifies is that, in Smith's Declaration, she stated: "I did not speak with Jeff Scher about anything related to this case. I certainly did not admit to him that I wrote the Facebook post." ECF 40-1, ¶ 20. Yet, at her deposition, she testified that she discussed the Facebook post with Jeff Scher. ECF 43-1 at 4:8-9. Smith testified during her deposition, ECF 43-1 at $4:18 - 5:3$:

> [Scher] actually was talking about me calling out or me did a no call, no show. That's what he was talking about. And then he just brung this up and said did you make a post. No. And I said I don't know nothing about no post. That was it. He didn't never mention anything else about it. But he did say something about a rat.

It is hard to see how Smith could construe the Facebook post as a topic unrelated to this case. Yet, Smith made no effort to explain this contradiction. *See* ECF 40; ECF 40-1. Therefore, where Smith's deposition testimony and Declaration conflict, the Court will disregard her Declaration and rely on her earlier deposition testimony. *See In re Family Dollar FLSA Litig.*, 637 F.3d 508, 513 (4th Cir. 2011).

The second supposed contradiction between Smith's Declaration and her deposition is that, in her Declaration, Smith stated: "Prior to May 18, 2017 I had made a request to be able to take off from work on May 19 through 22, 2017 because my PTO was expiring, and also because May

20, 2017 was my friend's birthday." ECF 40-1, ¶ 17. However, at her deposition, when Smith was asked why she requested those days off, she testified: "I was still very -- I felt very overworked. I felt -- I just found out I was pregnant and I needed some time off." Smith provides different reasons for requesting time off, but her reasons are not flatly contradictory. Nor do they create an unambiguous material inconsistency with her prior account. To be sure, her differing answers may be fruitful avenues of cross-examination at a trial. But, in my view, they are not so stark as to justify invocation of the sham affidavit rule.

## IV.    Discussion

"The FMLA is intended 'to balance the demands of the workplace with the needs of employees to take leave for eligible medical conditions and compelling family reasons.'" *Rhoads v. F.D.I.C.*, 257 F.3d 373, 381 (4th Cir. 2001) (quoting *Hukill v. Auto Care, Inc.*, 192 F.3d 437, 441 (4th Cir. 1999)). Under the FMLA, an "eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [i]n order to care for . . . a son, daughter, or parent, of the employee, if such . . . son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C).[5]

A "serious health condition" is an "illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." *Id.* § 2611(11). "Continuing

---

[5] An employee is eligible if the employee has "has been employed . . . (i) for at least 12 months by the employer . . . and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A). It is undisputed that Smith was an "eligible employee."

treatment" includes any "period of incapacity or treatment for such incapacity due to a chronic serious health condition." 29 C.F.R. § 825.115(c). "A chronic serious health condition is one which: (1) Requires periodic visits . . . for treatment . . . ; (2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and (3) May cause episodic rather than a continuing period of incapacity (e.g., *asthma*, diabetes, epilepsy, etc.)." *Id.* In some cases, absences "attributable to incapacity" due to a chronic serious health condition "qualify for FMLA leave even though . . . the covered family member does not receive treatment from a health care provider during the absence, and even if the absence does not last more than three consecutive, full calendar days. For example, an employee with asthma may be unable to report for work due to the onset of an asthma attack[.]" *Id.* § 825.115(f).

Under the FMLA, there are two types of claims: "(1) 'interference,' in which the employee alleges that an employer denied or interfered with her substantive rights under the FMLA, and (2) 'retaliation,' in which the employee alleges that the employer discriminated against her for exercising her FMLA rights." *Edusei v. Adventist Healthcare, Inc.*, DKC 13-0157, 2014 WL 3345051, at *5 (D. Md. July 7, 2014) (quoting *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 294-95 (4th Cir. 2009)). An interference claim "'merely requires proof that the employer denied the employee his entitlements under the FMLA[.]'" *Bosse v. Baltimore Cty.*, 692 F. Supp. 2d 574, 588 (D. Md. 2010) (quoting *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1051 (8th Cir. 2006)). In contrast, retaliation requires "'proof of retaliatory intent.'" *Bosse*, 692 F. Supp. 2d at 588 (quoting *Stallings*, 447 F.3d at 1051); *see also Eudesi*, 2014 WL 3345051, at *6.

## A.    Interference with FMLA Rights

Smith alleges that Caesars interfered with her FMLA rights by considering her FMLA leave as a factor in its decision to fire her. It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA. 29 U.S.C. § 2615(a)(1).  And, an employee has a cause of action against her employer if the employer interferes with FMLA benefits.  29 U.S.C. § 2617(a).

"To establish unlawful interference with an entitlement to FMLA benefits," a plaintiff must prove that (1) she was an eligible employee; (2) her employer was a covered employer; (3) she was entitled to leave under the FMLA; (4) she gave her employer adequate notice of her intention to take leave; (5) the employer denied her FMLA benefits to which she was entitled; and (6) the violation prejudiced her in some way. *Sherif v. Univ. of Md. Med. Ctr.*, 127 F. Supp. 3d 470, 477 (D. Md. 2015); *see also Rodriguez v. Smithfield Packing Co.*, 545 F. Supp. 2d 508, 516 (D. Md. 2008). "Harm or prejudice exists when an employee loses compensation of benefits by reason of the violation, sustains other monetary loses [sic] as a direct result of the violation, or suffers some loss in employment status remediable through appropriate equitable relief." *Whitt v. R&G Strategic Enterprises, LLC*, RDB-16-2492, 2018 WL 398289, at *5 (D. Md. Jan. 11, 2018). "Actions that constitute 'interfering with' an employee's FMLA rights include 'refusing to authorize FMLA leave'; 'discouraging an employee from using such leave'; 'avoid[ing] responsibilities under FMLA' and 'us[ing] the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions.'"  *Bosse*, 692 F. Supp. 2d at 585 (alterations in original) (quoting *Glunt v. GES Exposition Servs., Inc.*, 123 F. Supp. 2d 847,

870 (D. Md. 2000)) (internal quotation omitted); *see* 29 C.F.R. § 825.220(b)-(c). "In such a situation, an employer can avoid liability if it shows the plaintiff's FMLA leave was not a but-for cause of an adverse employment action." *Sparenberg v. Eagle All.*, JFM-14-1667, 2015 WL 6122809, at *4 (D. Md. Oct. 15, 2015) (citing *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 547 (4th Cir. 2006)).

It is undisputed that Smith was an eligible employee and that Caesars was a covered employer. It is unclear if Caesars disputes that Smith was entitled to FMLA leave. But, Smith provides ample evidence of A.C.'s asthma and the doctor's visit on May 19, 2017. *See, e.g.*, ECF 40-4; ECF 40-16. Accordingly, at a minimum, Smith has created a genuine dispute of fact as to the issue.

The parties primarily dispute two issues. First, did Smith provide Caesars with adequate notice of her intention to take FMLA leave? Second, was the taking of FMLA leave by Smith a factor in Caesars' decision to fire Smith?

### 1.     Notice

In Smith's Declaration, she claims that she told Carter on May 18, 2017, that she needed to take A.C. to the doctor on May 19, 2017, because he was "having an asthma episode." ECF 40-1, ¶ 9. And, she also said that she needed time off on May 20, 2017, to continue treatment for her son. ECF 39-4 at 41:11-14. As a result, she maintains that she provided Caesars with notice of her intent to take FMLA leave on May 19 and May 20, 2017. However, Caesars argues that Smith's interference claim should be summarily dismissed because her purported notice was insufficient. ECF 39-1 at 39-42.

"Employees must provide notice to their employer when they require FMLA leave." *Sherif*, 127 F. Supp. 3d at 477; *see* 29 C.F.R. § 825.302 (notice requirements for foreseeable FMLA leave); *id.* § 825.303 (notice requirements for unforeseeable FMLA leave). And, regardless of whether the need for the leave is foreseeable or unforeseeable, the employee must provide notice "as soon as practicable." 29 C.F.R. §§ 825.302(a), 825.303(a). To request leave, an "employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave." 29 C.F.R. §§ 825.302(c), 825.303(b). But, "[w]hen an employee seeks leave due to a qualifying reason, for which the employer has previously provided the employee FMLA-protected leave, the employee must specifically reference either the qualifying reason for leave or the need for FMLA leave. The employer will be expected to obtain any additional required information through informal means." 29 C.F.R. § 825.303(b).

The employee must also "comply[] with [the] employer's policy." *Id.* § 825.303(c); *see also id.* §§ 825.302(d). For example, an employer may require employees "to call a designated number or a specific individual to request leave." *Id.* § 825.303(c); *see id.* § 825.302(d). If "an employee does not comply with the employer's usual notice and procedural requirements, and no unusual circumstances justify the failure to comply, FMLA-protected leave may be delayed or denied." *Id.* §§ 825.302(d), 825.303(c).

Caesars employees may request approval for intermittent leave, "FMLA leave taken in separate blocks of time due to a single qualifying reason." 29 C.F.R. § 825.202(a). "Intermittent leave may be taken for a serious health condition of a . . . son . . . , which requires treatment by a

health care provider periodically, rather than for one continuous period of time, and may include leave of periods from an hour or more to several weeks." *Id.* § 825.202(b)(1). For example, intermittent leave includes leave taken occasionally for medical appointments, or "several days at a time spread over a period of six months, such as for chemotherapy." *Id.* Caesars requires an employee "call[ing] off for intermittent leave" to "confirm that the absence is related to a previously approved FMLA leave." ECF 39-28 at 3.

Caesars first maintains that Smith did not adhere to the proper process for obtaining approval for intermittent leave. ECF 39-1 at 40. Smith knew how to request FMLA leave due to her 2015 request for intermittent FMLA leave and her subsequent use of leave in 2016. *Id.* Yet, after her first leave period expired on January 5, 2017, she failed to renew her request for intermittent leave. *Id.* at 41. As a result, she had no current, approved FMLA leave as of May 18, 2017, when she allegedly requested FMLA leave.

To be sure, Smith did not renew her approval for intermittent FMLA leave. However, Smith contends that she was not requesting intermittent FMLA leave, but leave for an unforeseeable need. Smith could not reasonably foresee the "approximate timing" of her son's asthma episode. *Id.* § 825.303(a). Indeed, as Caesars notes, "other than her purported use of leave on May 19-20, 2017, Smith did not use FMLA leave in 2017." ECF 39-1 at 41. Moreover, Caesars does not claim that Smith could or should have foreseen her son's asthma episode. Therefore, summary judgment on these grounds would be inappropriate.

Next, defendant maintains that Smith did not request FMLA leave from Carter. ECF 39-1 at 42. Nor did Smith expressly invoke the FMLA or provide "any details of her son's asthma

condition." *Id.* Moreover, Caesars maintains that Smith's supervisors, including Carter, were unaware of Smith's prior FMLA leave or of her son's asthma. *Id.* Thus, in Caesars' view, Smith merely called in sick, which is not enough to trigger FMLA protections. *Id.*; *see* 29 C.F.R. § 825.303(b) ("Calling in "sick" without providing more information will not be considered sufficient notice to trigger an employer's obligations under the Act.").

This argument also fails. It is true that Smith did not state that she required FMLA leave. But, she did not have to. An "employee giving notice of the need for FMLA leave does not need to expressly assert rights under the Act or even mention the FMLA to meet his or her obligation to provide notice[.]" 29 C.F.R. § 825.301(b). It is enough for "the employee . . . to state a qualifying reason for the needed leave" and "explain the reasons . . . so as to allow the employer to determine whether the leave qualifies under the Act." *Id.* Further, "[i]n many cases, in explaining the reasons for a request to use leave, especially when the need for the leave was unexpected or unforeseen, an employee will provide sufficient information for the employer to designate the leave as FMLA leave." *Id.*

According to Smith's Declaration, she told Carter that she needed to take her son to the doctor on May 19, 2017, because he was "having an asthma episode." ECF 40-1, ¶ 9. Alerting an employer to an asthma episode is not the same as calling in sick. Asthma is a "chronic serious health condition" highlighted at least twice by the Department of Labor in its FMLA regulations. *See*, *e.g.*, 29 C.F.R. § 825.115(c)(3) ("A chronic serious health condition is one which . . . [m]ay cause episodic rather than a continuing period of incapacity (e.g., *asthma*, diabetes, epilepsy, etc.).") (emphasis added); *id.* § 825.115(f). Indeed, the regulations expressly provide that "an

employee with asthma" can take FMLA leave "due to the onset of an asthma attack," even if the employee "does not receive treatment from a health care provider during the absence." *Id.* § 825.115(f). Accordingly, even if Carter was not previously aware of A.C.'s asthma, Smith provided her with adequate notice of her FMLA leave request by disclosing the child's asthma episode.

Finally, Caesars claims that Smith failed to confirm that her absence is related to a previously approved FMLA leave, as required by the employee handbook. ECF 39-1 at 42; *see* The handbook provides, ECF 39-28 at 3: "When a Team Member calls off for intermittent leave she/he must confirm that the absence is related to a previously approved FMLA leave."

Caesars claims that its policy "is fully consistent with FMLA regulations." ECF 39-1 at 42 n. 4. The relevant FMLA regulation provides, 29 C.F.R. § 825.303(b): "When an employee seeks leave due to a qualifying reason, for which the employer has previously provided the employee FMLA-protected leave, the employee must specifically reference either the qualifying reason for leave or the need for FMLA leave. The employer will be expected to obtain any additional required information through informal means." Smith allegedly told Carter that A.C. was having an asthma problem and thereby "specifically reference[d] . . . the need for FMLA leave." Accordingly, a reasonable jury could determine that Smith complied with § 825.303(b) and, by extension, the employee handbook.

### 2. Denial of FMLA Benefit

Smith maintains that she was terminated due, in part, to her taking of FMLA leave, thereby denying her FMLA benefits to which she was entitled. ECF 40 at 17, 19-20. Caesars disagrees,

claiming that Smith "actually received the benefit she requested—time off on May 19 and May 20" and therefore cannot state a claim for interference. ECF 39-1 at 43.

However, Smith need not show that she was denied leave in order to sustain an interference claim. "Interference and prejudice exist where an employer discourages the taking of leave or *uses 'the taking of FMLA as a negative factor in employment actions*, such as hiring, promotions or disciplinary actions[.]'" *Sparenberg*, 2015 WL 6122809, at *4 (quoting 29 C.F.R. § 825.220(c)) (emphasis added); *see also Natal v. Arlington Cty. Pub. Sch.,* No. 1:18-CV-1178-AJT/MSN, 2019 WL 2453659, at *7 (E.D. Va. June 12, 2019); *Sherif*, 127 F. Supp. 3d at 477 n. 20; *Glunt*, 123 F. Supp. 2d at 870.

Defendant also argues that when Smith returned to work, she was not entitled to job restoration or protection from termination because of her earlier misconduct. ECF 39-1 at 43-44. That is, Smith's "purported attempt to use FMLA leave" was not a factor in her termination. *Id.* at 44. To "avoid liability[,]" Caesars must show the Smith's FMLA leave was not a but-for cause of her termination. *See Sparenberg*, 2015 WL 6122809, at *4 (citing *Yashenko*, 446 F.3d at 547).

The record shows that Caesars previously stated that it terminated Smith, in part, because she failed to attend work on May 19 and May 20. In "Defendant's Responses And Objections To Plaintiff's First Set Of Interrogatories," Caesars denied liability to Smith "for interference with her FMLA rights" because her "discipline and termination were unrelated to any exercise of her FMLA rights[.]" ECF 40-7 at 8-9. Rather, Smith's discipline and termination were "based on the fact that *[she] inappropriately missed work after her request to take PTO for a vacation was denied due to scheduling needs* and on the fact that Plaintiff posted to Facebook an inappropriate message

concerning her job and supervisors that was seen by at least one of her subordinates." *Id.* at 9 (emphasis added).

Further, when asked to cite "discipline administered to the Plaintiff as a result of any inappropriate behavior" and "job performance problems which contributed to Plaintiffs [sic] termination," defendant cited "plaintiff's plan to call out of work on May 19 and May 20, 2017, despite denial of her request for PTO, and of Plaintiff's statement that she had already purchased airline tickets for a pre-planned vacation on those days." *Id.* at 5. Likewise, defendant stated that "Scher . . . has knowledge of the discipline issued to Plaintiff and the circumstances leading to the issuance of such discipline (*Plaintiff's failure to show up for work on May 19 and 20, 2017* and her inappropriate Facebook posting), and was the ultimate decisionmaker for the issuance of such discipline." *Id.* at 6 (emphasis added).

In light of these statements, a reasonable jury could conclude that Smith's absences were a "negative factor" in her termination. And, "[i]f those absences were, in fact, covered by the Act, [defendant's] consideration of those absences as a 'negative factor' in the firing decision violated the [FMLA]." *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1126 (9th Cir. 2001). It is undisputed that Smith's son had an asthma episode and that Smith took him to the doctor on May 19, 2017, for his asthma. Furthermore, Smith maintains that she told Carter that her son was having an asthma episode. ECF 40-1, ¶ 9. Accordingly, there is a triable issue of material fact as to whether Caesars considered Smith's FMLA leave as a factor in her termination and thereby interfered with her rights under the FMLA.

Moreover, Caesars fails to show that Smith's absences were not a but-for cause of her termination. In its Motion, Caesars claimed that it terminated Smith for the following reasons, ECF 39-1 at 43-44:

> (a) Smith admitted to Carter that she intended to use the hourly employee call-out line when she intended to be absent from work on May 19-20; (b) Smith made a Facebook post where Horseshoe thought she called her colleagues and co-workers "rats" for having reported Smith's plan to their managers, a post which was seen and liked by at least one of Smith's own subordinates; (c) Smith admitted to making the Facebook post; and (d) one of her coworkers advised Smith to call her managers directly and not use the call-out line but Smith said she planned to just use the call-out line anyway.

(internal citations omitted).

To be sure, Caesars has consistently characterized Smith's intent to use the call-out line and the Facebook post as a disciplinary problem. *See, e.g.*, ECF 40-7 at 5; ECF 39-1 at 29. But, as noted, in Caesars' response to an interrogatory, Smith's intended use of the call-out line appears to be secondary relative to Caesars' focus on Smith's absences from work. ECF 40-7 at 8-9 (listing her Facebook post and absences, but not her intended use of the call-out line, as reasons for her termination). Additionally, Smith contends that she did not admit that she made the Facebook post, and she denies that she made the Facebook post. ECF 40-1, ¶¶ 19, 20. Moreover, Lattimer and Olaya both said that they had not previously disciplined an employee for making an inappropriate Facebook post. ECF 39-16 at 12:19 – 13:3 (Lattimer); ECF 39-22, ¶ 6 (Olaya).

Given plaintiff's claim as to FMLA notice to the employer on May 18, 2017, discussed earlier, and in light of defendant's previous statements that it terminated Smith because of her absences, a reasonable jury could find that Caesars would not have fired Smith but for her her taking of FMLA leave.

## B.     Retaliation

### 1.

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). "While the FMLA does not specifically forbid discharging an employee in retaliation for his use of FMLA leave, 29 C.F.R. § 825.220(c) states that employers are 'prohibited from discriminating against employees or prospective employees who have used FMLA leave' and that 'employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions.'" *Dotson*, 558 F.3d at 294-95; *see also Greene v. YRC, Inc.*, 987 F. Supp. 2d 644, 655 (D. Md. 2013). Thus, courts have interpreted the FMLA to provide a cause of action for retaliation. *Dotson*, 558 F.3d at 295.

To establish a prima facie case of retaliation under the FMLA, an employee must prove that "(1) she 'engaged in protected activity;' (2) 'an adverse employment action was taken against her;' and (3) 'there was a causal link between the protected activity and the adverse employment action.'" *Wright v. Southwest Airlines*, 319 Fed. Appx. 232, 233 (4th Cir. 2009) (quoting *Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir. 2004)).

An employee may prove an FMLA retaliation claim by proffering "direct or indirect evidence of retaliation," or proving "his case under the *McDonnell Douglas* burden-shifting framework." *Sparenberg*, 2015 WL 6122809, at *8. "To avoid summary judgment, the plaintiff must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact." *Rhoads*, 257 F.3d at 391

(alteration in original). "Direct evidence encompasses 'conduct or statements' that both (1) 'reflect directly the alleged discriminatory attitude,' and (2) 'bear directly on the contested employment decision.'" *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 717 (4th Cir. 2013) (quoting *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006)). "[D]irect evidence must demonstrate that an adverse employment action was actually 'due to . . . FMLA leave as opposed to some other lawful reason.'" *Sharif*, 841 F.3d at 205 (quoting *Laing*, 703 F.3d at 718 n.1).

Smith asserts that defendant's suspension and termination documents as well as defendant's answer to an interrogatory constitute direct evidence of defendant's interference with plaintiff's FMLA rights. As noted, *supra*, during discovery, Caesars stated that it terminated Smith because she "inappropriately missed work after her request to take PTO for a vacation was denied due to scheduling needs" and made an inappropriate Facebook post. ECF 40-7 at 9; *see also* id. at 5 (naming plaintiff's absences on May 19 and May 20, 2017 as an "inappropriate behavior" or "job performance problem"); *id.* at 6 (characterizing "Plaintiff's failure to show up for work on May 19 and 20, 2017 and her inappropriate Facebook posting" as the "circumstances leading to the issuance of" discipline against Smith).

In short, Caesars repeatedly stated that it relied on Smith's absences as a justification for terminating her. Despite the Company's previous statements to the contrary, it now repeatedly asserts that Smith's absences were irrelevant. According to Caesars, "Smith was *not* disciplined for her absences from work on May 19 and May 20, 2017." ECF 39-1 at 24 (emphasis in original); *see also id.* at 43 n. 5 ("Smith was ***not*** disciplined for her absences from work on May 19 and May 20.") (emphasis in original). Likewise, "Goldenthal did not investigate the reason for Smith's

absences on May 19, 2017 and May 20, 2017 because [Smith's] absences played no role in any of the discipline issued." *Id.* at 15. Further, Caesars asserts, "While Smith may be focused on the alleged reason for the absences—purportedly to care for her son—the reason for Smith's absences on May 19 and May 20, 2017 played absolutely no role in the discipline issued. Indeed, she was not disciplined for being absent on those days." *Id.* at 33.

However, an employer providing "'different justifications at different times for [an adverse employment action] is, in and of itself, probative of pretext'" for FMLA retaliation under the *McDonnell Douglas* framework. *Jacobs*, 780 F.3d at 576 (quoting *Sears Roebuck & Co.*, 243 F.3d at 852-53); *see also Stallings*, 447 F.3d at 1052 ("An employee may prove pretext by demonstrating that . . . the employer changed its explanation for why it fired the employee[.]"). Accordingly, a jury could reasonably conclude that Caesars terminated Smith in retaliation for taking FMLA leave. *See, e.g.*, *Sparenberg*, 2015 WL 6122809, at *8.

**2.**

Caesars contends that there is no causal connection between Smith's attempt to request leave and her subsequent termination. ECF 39-1 at 45-46. Smith's supervisors neither knew nor should have known that Smith was "attempting to invoke the FMLA." *Id.* at 45. According to Caesars, Smith's managers did not know that Smith's son had asthma or that Smith had previously been approved for intermittent leave for her son's asthma. *Id.* at 46. Caesars also places significant weight on the fact that Smith did not expressly invoke the word "FMLA." *Id.* at 45. Smith does not address this argument. *See* ECF 40.

"[N]o causal connection can exist between an employee's protected activity and an employer's adverse action if the employer was unaware of the activity." *Strothers v. City of Laurel, Md.*, 895 F.3d 317, 336 (4th Cir. 2018). However, an "employer is aware of an employee's protected activity when he learns of an employee action that he understood or should have understood to be" a protected activity under the FMLA. *Id.* To determine if an employer should have understood that the employee engaged in a protected activity, "courts examine not just the employee's complaint but also the factual context that is known to the employer." *Id.*

In *Okoli*, *supra*, 648 F.3d at 218, a female employee filed a formal complaint against her male supervisor, claiming he "displayed unethical and unprofessional business characteristics, e.g., *harassment*, degrading and dehumanizing yelling and demanding, disrespect, mocking and gossiping about other colleagues (anyone in the City government) and lack or disregard for integrity." (Emphasis added). That afternoon, she was fired. She brought multiple Title VII claims, including retaliation, but the trial court ruled against her at summary judgment. On appeal, her employer maintained that it did not understand the plaintiff to be engaging in a protected activity because her complaint referenced only "harassment," not "sexual harassment." *Id.* at 223-24. The Fourth Circuit rejected the employer's argument, concluding that the employer "surely should have known that [the employee's] complaints of 'harassment' likely encompassed sexual harassment." *Id.* at 224.

Here, the parties dispute whether Caesars knew or should have known that Smith was taking FMLA leave. But, Smith claims she told Carter that she needed to take her son to the doctor because he was "having an asthma episode." ECF 40-1, ¶ 9. An asthma episode is a prototypical

example of a chronic serious health condition, as evidenced by FMLA regulations expressly highlighting asthma as a chronic health condition. *See* 29 C.F.R. § 825.115(c)(3); *see also id.* § 825.115(f). Smith's statement alone constitutes sufficient notice to Caesars that she needed FMLA leave.

Indeed, the FMLA regulations explicitly reject Caesars' argument: "An employee giving notice of the need for FMLA leave does not need to expressly assert rights under the Act or even mention the FMLA to meet his or her obligation to provide notice, though the employee would need to state a qualifying reason for the needed leave[.]" 29 C.F.R. § 825.301(b). Accordingly, Caesars fails to show that there was no causal relationship between Smith's absences and her termination.

## V. Conclusion

For the reasons stated above, I shall deny defendant's Motion for Summary Judgment. ECF 39. An Order follows.


Date:   August 9, 2019                                    _____/s/_____
                                                          Ellen L. Hollander
                                                          United States District Judge